38

1                              GEORGE SINNOTT

2     federal government.  It's a $5 billion plan with 1.1

3     million participants.  We had an employee health service

4     that had 24 different nursing stations at various parts

5     of the state of New York.  We had a Municipal Services

6     Division where we have 104 municipal Civil Service

7     offices scattered throughout the State of New York.

8              We had a budget deficit where I was involved

9     constantly time frame wise with the Division of the

10    Budget, counseling other department heads of almost

11    every state agency in the State of New York.  I had to

12    write this task force report on the Civil Service.  I

13    did big picture.  I did policy, and I tried to do it to

14    the best of my ability.  I did not micromanage.  I never

15    have in any capacity where I've ever worked.  I viewed

16    myself to be the CEO, and I viewed Tom Pillsworth and

17    the division directors to be the operating officers, tom

18    Pillsworth to be the chief operating officer and the

19    division directors to be the primary operating officers

20    in their respective divisions.

21         Q.    So when you received a complaint from

22    Bouldin/Simpson of the sort you previously described,

23    you gave it to him and requested some report back from

24    him, or you just gave it to him and expected him to deal

25    with it?

1                    GEORGE SINNOTT

2        A.    My recollection is that I gave him a heads-up.

3    I have it in my head that I might have even asked them

4    to hand them in, but I don't specifically recall.

5        Q.    Do you recall meeting with Simpson and Bouldin

6    about this issue?

7        A.    I don't know if we met one-on-one or not.  You

8    know, just in the way of correspondence, Mr. Sussman,

9    you should be aware that we had a central correspondence

10   unit that had four full-time people just handling mail

11   that came in to the agency.

12       Q.    Okay.  But this is not mail coming in as such;

13   this is from your own staff.

14       A.    Right.

15       Q.    Okay.

16       A.    By the way, they also handled

17   interdepartmental memos.

18       Q.    Okay.  So you have a recollection of having

19   the concern expressed.  You believe you would have, if

20   you don't remember exactly, given this off to

21   Pillsworth.  And your expectation at that point was that

22   he might have met with them; is that accurate?  You

23   don't remember, but --

24       A.    I don't.

25       Q.    Okay.  Did you hear anything else about their

1                          GEORGE SINNOTT

2    concern, to your memory?

3          A.    Well, there's something larger there that was

4    a general sense.

5          Q.    Okay.  What was that?

6          A.    Mert Simpson and James Bouldin were active in

7    the affirmative action community, the Affirmative Action

8    Advisory Council.  Part of their jobs was going to

9    different agencies and meeting with people of like title

10   and position.  And there was an undercurrent as a result

11   of friendships and professional relationships that

12   people in the Division of Diversity Planning and

13   Management, not just Mert and Jim, but others, and there

14   was a dynamic within that community that was not

15   necessarily a dynamic over the State of New York or

16   anywhere near as a whole, is my point.

17         Q.    Well, what was the dynamic with regard to the

18   battery test?

19         A.    There were people, I think, who wanted change

20   and there were people who did not want change.

21         Q.    In this community, though, in the affirmative

22   action community, to use your term, did you sense or

23   believe they opposed the battery test?

24         A.    I had a sense afterwards that they did.  When

25   I say "they," I mean a very, very small minority.  You

1                              GEORGE SINNOTT

2      should know that I made a point, certainly more than any

3      of my predecessors, in that position.  There is a group

4      called the Affirmative Action Advisory Council, and they

5      were really the primary movers and shakers in the

6      individual agencies relative to affirmative action

7      issues.  There was -- I don't know if it was a charter

8      or if it was legislation, but prior to my arrival, I

9      believe it was legislation creating the Affirmative

10     Action Advisory Council, and they were to meet

11     quarterly.  And prior to my arrival, they had met once

12     in eight years.  After my arrival, we met quarterly.  I

13     met constantly with the elected members of the

14     Affirmative Action Advisory Council.

15          Q.   Who was on this council, just so we're clear?

16          A.   I believe there was one -- there was one

17     president who was president, I believe, for six or eight

18     years.  Omeye Cooper.

19          Q.   What agency was Cooper with?

20          A.   Criminal Justice Services or Probation.  I

21     don't know.  It was something out of my agency.

22          Q.   Just so we're clear, are these individuals

23     affirmative action officers for different agencies who

24     have gathered together in this council?

25          A.   Correct.

42

```
1                        GEORGE SINNOTT

2       Q.    Okay.

3       A.    And prior to my arrival --

4       Q.    You said that.

5       A.    -- they didn't meet.  They hadn't -- they had

6  no central way of communicating.

7       Q.    Okay.

8       A.    I provided services in the way of computer,

9  monitor, software, hardware, help put together a

10 newsletter.  I spoke at probably every Affirmative

11 Action Council annual meeting that they had.  And I used

12 to get mixed reviews, because I would hear internally on

13 occasion or the whisper or the voice of Mert and Jim

14 Bouldin, and yet I would go to an Affirmative Action

15 Advisory Council meeting and I would have people come up

16 and shake my hand and say, "Thanks.  This is the first

17 time I had a chance to take an exam in six years.  I

18 passed.  I just got promoted."  So I got a mixed sense.

19      Q.    Let me ask you this.  Did the affirmative

20 action -- this advisory council, to your knowledge, ever

21 do any study of the results of the test?  Apart from the

22 individual, "I got a promotion; I didn't get a

23 promotion," did you see any kind of data which they

24 generated?

25      A.    No.
```

43

1                         GEORGE SINNOTT

2         Q.   Did you see any report which that group

3    generated regarding the test and how it impacted people

4    of color or didn't?

5         A.   I don't believe I did.  To my knowledge, there

6    wasn't a report.  To my knowledge.

7         Q.   So you don't know of any such report?

8         A.   Correct.  Yes.

9         Q.   Now, from your own agency, putting aside these

10   various offices, did your own agency give you any report

11   on adverse impact at any time, to your knowledge?

12        A.   Not to my knowledge.

13        Q.   Did you ever ask for one in light of these

14   rumblings, rumors?  Did you ever talk to anybody and

15   say, "What's the real story here?"

16        A.   Yes.

17        Q.   You did.  Who did you talk to, other than the

18   lawyer, if you talked to anyone other than the lawyer?

19        A.   I would have spoken to the director of

20   testing.

21        Q.   Beninati?

22        A.   Correct.

23        Q.   Did Beninati tell you that they had done some

24   sort of study on adverse impact and what it showed?  Did

25   he tell you that?

COURT REPORTING ASSOCIATES, INC.

44

```
1                        GEORGE SINNOTT
2        A.   He had indicated to me that, in his view, it
3   was a valid exam and that these criticisms were not
4   accurate.
5        Q.   Did he tell you that he had studied adverse
6   impact, one way or the other?
7        A.   I don't recall the term "adverse impact," if
8   that was specific.
9        Q.   Okay.  Well, adverse impact --
10       A.   He indicated to me that he had reviewed the
11  examinations.  We had --
12       Q.   This is personal, you and Beninati?
13       A.   Yes.
14       Q.   Do you know when this happened?
15       A.   No.
16       Q.   Did it happen after that Complaint was filed?
17       A.   I don't know when it happened.
18       Q.   Did it happen more than once that you had that
19  kind of conversation directly with Beninati?
20       A.   I had --
21       Q.   When he said it was a valid exam.  That's what
22  I'm asking you.
23       A.   Yes.
24       Q.   You did.  More than once?
25       A.   I believe so.
```

1                        GEORGE SINNOTT

2          Q.    Okay.   Did he ever make any claims to you

3    about the racial impact of the exam?   If you don't want

4    to use the word "adverse impact," racial impact?

5          A.    We discussed -- I discussed with him in

6    general terms the notion that when we set this up, we

7    were going to have subject matter experts and people

8    from the minority community have input relative to the

9    makeup of the examination.

10         Q.    This was your idea?

11         A.    I believe it was.

12         Q.    Did he tell you that the agency had been doing

13   that for 20 years?

14         A.    He --

15         Q.    Both of those things?

16         A.    He was familiar with -- he was familiar with

17   what I was discussing.   And I had indicated always from

18   the get-go that because this was different and because

19   it was novel, we wanted to be assured that what we were

20   giving was valid.

21         Q.    Okay.   Let's just separate for a minute valid

22   from the racial impact.   You're answering about valid.

23   And we'll get to valid in a little bit.

24                Understanding that you're a generalist, by

25   your own statement, did you have any curiosity, as a

46

1                    GEORGE SINNOTT

2    commissioner who had this novel idea and saw the novel

3    idea being implemented, did you have any curiosity as to

4    how the different groups in the state were doing on this

5    exam?

6        A.    Not more than the curiosity I had with I guess

7    every other damn thing that was going on at the time.

8        Q.    Well, you testified here today about a history

9    of commitment, including your thesis to affirmative

10   action, to inclusion, to equal opportunity.  Now you're,

11   by your statements, initiating this novel idea.

12       A.    Okay.

13       Q.    So what I'm asking you is, in the context of

14   initiating this novel idea, did you -- and you may not

15   have, but did you ever think to yourself, what impact is

16   this going to have on the inclusion of minorities in the

17   state's work force?  Did you ever think about that?

18       A.    Yes.

19       Q.    You did.  Okay.  Did you ever get any kind of

20   data on promotion rates of minorities, to your

21   recollection?

22       A.    I don't remember getting data.  I remember

23   being told.

24       Q.    You were told something.  By whom?

25       A.    I remember being told by the people in Testing

47

1                          GEORGE SINNOTT

2      that they deemed the test to be appropriate.

3          Q.    Okay.  Now I'm asking you, apart from their

4      deeming it appropriate or not deeming it appropriate,

5      I'm asking you a different question.

6          A.    Okay.

7          Q.    The test is being taken, as you said before,

8      by thousands of people around the state, so did the

9      people in Testing give you any understanding of how

10     different groups were doing on the test?

11         A.    I don't even know if they -- I don't even know

12     if they had that data or collected that data prior to

13     anything happening with the EEOC.

14         Q.    Okay.  And you're sitting here today and

15     you're telling me before the EEOC, you're not even sure

16     they had data available to them as to the racial

17     breakout of test results?  You're not sure?

18         A.    I don't know.

19         Q.    Okay.

20         A.    I --

21         Q.    Okay.

22              MR. KERWIN:  Wait a minute.  He's

23     finishing his answer.

24         A.    I didn't even know if we could collect that

25     data prior to an examination.

48

1                        GEORGE SINNOTT

2        Q.    You didn't know if it was collected?

3        A.    No, I didn't know if it was legally

4   appropriate to collect data prior to either a test or

5   prior to appointment from a list.

6        Q.    Well, did you know as a factual matter whether

7   it was being collected?

8        A.    I don't know.

9        Q.    Did you ever ask any of the people in Testing

10  or Classification whether it was being collected?

11       A.    In a general sense, I asked people if there

12  was merit to what was being indicated in correspondence

13  or in conversations or in whispers or what have you

14  from --

15              MR. SUSSMAN:  Move to strike.

16       Q.    The question is a simple question.  Did you

17  ever ask anyone whether the race of the applicants, the

18  test takers, was collected by the Division of Testing or

19  the Department of Civil Service?

20       A.    My instinct would tell me that I probably did,

21  but I don't know if -- I don't recall if I did.

22       Q.    Do you remember the answer?

23       A.    The answer to what?

24       Q.    That question, back in the time that you

25  became the commissioner.  Was it being --

49

1                    GEORGE SINNOTT

2               MR. KERWIN:  He said --

3       A.   I said I don't even know if I asked it is my

4    point.

5       Q.   Okay.  Very well.

6               MR. KERWIN:  Can we take a break and get

7    more water?

8               MR. SUSSMAN:  Sure.

9               (Brief recess taken.)

10   BY MR. SUSSMAN:

11      Q.   Mr. Sinnott, did you have a cabinet that met

12   regularly when you served as the lead commissioner of

13   Civil Service?

14      A.   I met with division directors.

15      Q.   As a group?

16      A.   Actually, I think I did for maybe the first

17   year or so.

18      Q.   Okay.

19      A.   Then after that, as I was traveling much more

20   extensively and getting involved in other things, we --

21      Q.   It stopped?

22      A.   Yeah.

23      Q.   During the first year, we're speaking of '95,

24   '96, that time frame?

25      A.   Uh-huh.  Primarily '95.

50

1                        GEORGE SINNOTT

2        Q.   So you remember that by '96, that process had

3    pretty much stopped?

4        A.   Yes.

5        Q.   Do you know if Mr. Pillsworth in your absence

6    continued to convene as the chief operational officer of

7    those kinds of cabinet level meetings, or do you not

8    know?

9        A.   I know he met with -- he always met and

10   conferred with division directors.  Whether he did it

11   collectively in the same room, I don't know.

12       Q.   Okay.  Do you have any knowledge of what a DIF

13   means, D-I-F?  Have you ever heard that term?

14       A.   I don't believe so.

15       Q.   Do you have any knowledge of what the term

16   "item analysis" means in the testing area?  Have you

17   ever heard that term?

18       A.   I've heard it.

19       Q.   Do you know what it means?

20       A.   No.

21       Q.   Do you have any understanding of the

22   difference between content validity, criterion

23   referenced validity, and construct validity?  Do those

24   terms have any particular meaning to you?

25       A.   They have no meaning to me.

COURT REPORTING ASSOCIATES, INC.

51

```
1                        GEORGE SINNOTT

2        Q.   Do you have any knowledge of what BIG is,

3   Blacks in Government?

4        A.   Yes.

5        Q.   Did you have any meetings with Blacks in

6   Government during the time that you were the

7   commissioner of Civil Service, to your memory?

8        A.   No, I don't ever remember being asked.

9        Q.   You were never invited to a meeting and never

10  attended a meeting, to your knowledge?

11       A.   Never invited or attended.

12       Q.   You know who Paul Kaiser is?

13       A.   I do.

14       Q.   We marked at Paul Kaiser's deposition this

15  document.

16       A.   The agency received an award in --

17       Q.   Hold on.  Hold on.  Take your time.

18       A.   Okay.

19       Q.   We marked at his deposition this document,

20  which is the Promotion Test Battery Program Assessing

21  Managerial Competencies, New York State, prepared for

22  IPMA Assessment Council, Conference on Personnel

23  Assessment, June of '05.  That's Kaiser 33.

24       A.   And your question?

25       Q.   Are you familiar with this document?  I know
```

52

1                        GEORGE SINNOTT

2    you're pictured at the end thanking IPMA, but apart from

3    that, are you familiar with it?

4        A.   Would that be the handsome gentleman on the

5    left?  Huh-uh.

6        Q.   Appears to be.  Looks a lot like you today,

7    sir.

8             In any event, do you have any knowledge of

9    this particular document?  Did you go to this meeting,

10   to your recollection?

11             MR. KERWIN:  Wait a minute.  Did he

12   answer your last question?

13             MR. SUSSMAN:  I thought he said no.

14       A.   I don't recall seeing this document, and I

15   don't believe I went to Arlington, Virginia.

16       Q.   There was an award, you started mentioning,

17   given in 2000 by IPMA called the Innovations Award.

18       A.   Actually, I was going to mention another award

19   too.

20       Q.   All right.  Let's talk about this award first.

21       A.   Okay.

22       Q.   Do you have any knowledge of this award?

23       A.   Yes.

24       Q.   Okay.  Do you know whether it was given for

25   the battery?

53

GEORGE SINNOTT

1

2     A.    Correct.

3     Q.    And did you speak with anyone in reference to

4 this award?  Did anybody call you about it, to your

5 recollection?  This IPMA, I-P-M-A?

6     A.    Right.  I've spoken at IPMA conferences, but I

7 don't believe I ever addressed the -- there are

8 subsections.  I did their general conferences.

9     Q.    As far as you remember, you don't remember

10 this being addressed when you were there, the battery

11 test?

12     A.    I remember I was getting an award for it.

13     Q.    I'm saying when you were there and spoke, you

14 don't remember addressing this issue?

15     A.    Well, when I spoke, I'd address it.

16     Q.    You did address it?

17     A.    At the times I spoke at IPMA conferences, it

18 was to talk of the new New York State Civil Service, and

19 the promotion test battery was one of the components of

20 eight different things; and in that sense, I would give

21 a general overview of what it was and how we had tested

22 thousands of people who were not provided that privilege

23 in prior years.

24     Q.    Okay.  And were there any panels that you

25 participated on, do you have any recollection of?

54

1                          GEORGE SINNOTT

2          A.    I was a keynote speaker at a number of those

3     different functions regionally and nationally.  I don't

4     know anything specific about a panel.

5          Q.    Okay.  And you were mentioning there was some

6     other award.  What was the other award you wanted to

7     talk about?

8          A.    Well, actually, we received -- I was

9     privileged to receive it on behalf of the agency, the

10    Employee Round Table Award that was presented to me by

11    Vice President Al Gore, and it was a result of all of

12    the changes that had been made at the Department of

13    Civil Service, and I believe we were voted the best

14    state department in the United States.  And one of the

15    agencies that was involved -- it was like a conglomerate

16    of, I believe, 16 or 26 different national

17    organizations -- and BIG was one of those that

18    participated in presenting us that award.

19         Q.    What year was this?

20         A.    Maybe '98 or '99.

21         Q.    Had you presented about the battery to that --

22    to get that award, was that one of the things you

23    submitted in furtherance of getting an award?

24         A.    The whole package which you had showed

25    earlier.

55

1                          GEORGE SINNOTT

2          Q.    This package?

3          A.    No, not that package.

4          Q.    The report?

5          A.    The report.

6          Q.    From '95?

7          A.    Correct.

8          Q.    Okay.  I got you.  And your understanding was

9     that the award from the vice president in '98 was, in

10    part, based on the report that you prepared a few years

11    earlier?

12         A.    I believe it was primarily solely on the

13    report and the follow-up action as a result of that

14    report.  There was a great deal of interest as a result

15    of Governing Magazine having written a cover story on

16    the New York State Department of Civil Service following

17    the institution of all of these recommendations.

18         Q.    Okay.  Now, in the period after the Complaint

19    was filed, the charge was filed by the individuals,

20    Mr. Simpson, Ms. Ross, and others, did you go to speak

21    to the EEOC yourself on any occasions?

22         A.    No.

23         Q.    Did you have any conversations by phone with

24    anyone from the EEOC?

25         A.    No.

56

1                  GEORGE SINNOTT

2        Q.   Did you speak to anyone in the Justice

3    Department concerning this matter?

4        A.   I don't believe I discussed it with anybody

5    outside the agency.

6        Q.   So as far as you can recall, you don't recall

7    being at a meeting either in Albany or Washington or

8    New York City with anybody from either of those

9    agencies?

10        A.   Not to my recollection.

11        Q.   Who did you brief regarding agency business

12    from the governor's office?  Did you have a staff person

13    you interfaced with?

14        A.   Primarily James Natoli was director of state

15    operations.

16        Q.   Did he remain in that position through the

17    early part of 2000?

18        A.   I believe he did.  No.  Actually, no.  I don't

19    know the year 2000.  He was reassigned -- he was out of

20    there when I left the Department of Civil Service, but

21    I --

22        Q.   Okay.  When was that?

23        A.   I left in April of '04.  I don't recall

24    whether Mr. Natoli left in 2000 or 2002 or 2003.

25        Q.   Did Mr. Natoli and you ever have any

COURT REPORTING ASSOCIATES, INC.

57

1                          GEORGE SINNOTT

2     conversations about the battery exam?

3          A.    Not specifically, no.

4          Q.    Did you directly brief the governor regarding

5     the exam?

6          A.    No.

7          Q.    When correspondence came in to your attention

8     at the agency, was there a standard protocol for how the

9     correspondence was to be handled?

10         A.    I believe so.

11         Q.    What was it, as you remember it?

12         A.    I don't know.

13                    MR. SUSSMAN:   Mark as Exhibit 106.

14                    (Plaintiffs' Ex. 106 - NYS OMCE marked

15                    for identification.)

16    BY MR. SUSSMAN:

17         Q.    Take a look at 106.   The first question I'm

18    going to have for you is, do you know who Barbara Zaron,

19    Z-A-R-O-N, is?

20         A.    Yes, I do.   I know her.

21         Q.    I'll go to particular parts of this in a

22    moment.   Do you know Barbara Zaron from her service with

23    the Organization of New York State Management

24    Confidential Employees or otherwise?

25         A.    I know her professionally and socially as a

58

1                         GEORGE SINNOTT

2    result of just having worked together over the years.

3         Q.   Did you know her in 1999 in that way?

4         A.   I did.  We used to do annual TV shows together

5    on the state work force.

6         Q.   The first two pages of this document represent

7    a letter from her to you dated March 11, 1999.  And

8    "Dear Commissioner Sinnott" seems to be crossed out and

9    "George" is written there.

10        A.   Uh-huh.

11        Q.   Do you have any recollection of this letter?

12        A.   I have a recollection of getting numerous

13   letters from Barbara Zaron.

14        Q.   Did you get them directly, or were they --

15        A.   I don't know.  I've seen them.  Whether they

16   came to others first or not, I wouldn't know.

17        Q.   This particular letter relates to what she

18   calls "concerns about the possible negative ethnic

19   impact of the results of Examination No. 04-142, Chief

20   of Mental Health Treatment Services, M5."  Do you see

21   that?

22        A.   Yes.

23        Q.   Do you have any recollection of that issue?

24        A.   I can give you a general recollection.

25        Q.   You can?

59

1                    GEORGE SINNOTT

2      A.   Of correspondence from Barbara Zaron.

3      Q.   On that issue?

4      A.   On correspondence in general.

5      Q.   Okay.

6      A.   And that recollection is that I never

7  comprehended what it was she was asking for, nor did I

8  understand the technical aspects of percentages and

9  things of that nature that she inquired of.

10     Q.   Okay.  The document that's second in the

11 exhibit is a letter from October 1st, 1997.  And that

12 has in it a chart on page 2 which has certain --

13 displays certain data relating to both gender, race,

14 national origin.  Do you have any recollection of

15 getting this?

16     A.   I do.

17     Q.   You do.

18     A.   Not this specific, as I indicated earlier.  A

19 number of different writings from Barbara Zaron.

20     Q.   When you got a document which had statistical

21 information or a type of analysis, at least, that you

22 didn't have a background in, did you speak to Tom

23 Pillsworth about that, typically?

24     A.   That would normally be the routine.

25     Q.   And Tom Pillsworth had a more technical

60

1                           GEORGE SINNOTT

2    background than did you in testing?

3        A.    Yes.  I have no technical background in

4    testing.  Never did.

5        Q.    So he had, I say, a more technical background

6    than you.

7        A.    Yes.

8        Q.    I think you made clear your background in that

9    regard.

10              Now, did you ever learn what the term "pass

11   rates" meant, or not really?

12       A.    I'll answer that by, I guess, indicating a

13   shortcoming on my behalf.  I don't -- I didn't then and

14   I don't to this day understand what a raw score is.  I

15   don't understand the difference, and I tried, obviously

16   not enough, between what's a test and what's an exam.  I

17   thought a test was a test and an exam was a test, but

18   testing people tell me I'm off target, which is a nice

19   way of saying, "Hey, Commissioner, you're not too swift

20   when it comes to this."

21       Q.    Do you know whether the battery, what you just

22   said, is a test or an exam?

23       A.    It's one or the other.

24       Q.    You don't know which?

25       A.    No.

61

1                    GEORGE SINNOTT

2        Q.    Okay.  Can you articulate the difference

3    between the two, or not really?

4        A.    Not really.

5        Q.    Okay.  Do you have any recollection of sitting

6    and talking with Barbara Zaron about her issue or issues

7    as addressed in the letters that are part of this

8    document?  Do you have any memory of that?

9        A.    I don't, but -- I don't.

10       Q.    Okay.  That's fine.  I'm looking at pages 22

11   and 23 of this document, which is somewhat in.  There's

12   a letter dated June 29, 1999, from you.  I want to ask

13   you about that letter.  Can you find it?  It's in --

14       A.    I'm sorry.  I'm just thinking.  I know I met

15   with Barbara Zaron and Joe Sanno (phonetic) on one of

16   these things.

17       Q.    Maybe this document will trigger your memory

18   about it.

19       A.    I'm sorry?

20       Q.    Maybe the June 29th letter of '99 will trigger

21   you.

22       A.    Okay.

23       Q.    It may be a wrong assumption, but I'm assuming

24   that someone wrote this letter for you as the

25   commissioner?

62

1                    GEORGE SINNOTT

2        A.   That's a good assumption.

3        Q.   There aren't initials at the bottom, so do you

4    have any idea who wrote this particular letter?

5        A.   No.  I believe my secretary put her initials

6    at the bottom of my correspondence.

7        Q.   But there are no initials here, are there?

8        A.   No.

9        Q.   Was there a delegation that you can remember

10   as to, in a matter like this involving testing and

11   questions of testing, who would have written it?

12       A.   On subject matters that I was not well versed,

13   I would defer to Tom Pillsworth to either draft a letter

14   for my signature or have somebody conversant in the

15   subject matter to draft a letter for my signature.

16       Q.   Okay.  You told us earlier, sir, that you left

17   Civil Service in, I believe you said, the spring of

18   2004?

19       A.   April of 2004.

20       Q.   Where did you at that point go?

21       A.   I went to become the chief executive officer

22   of the New York State Bridge Authority.

23       Q.   Is that what you're still doing?

24       A.   Correct.

25       Q.   Is that also in Albany?

63

1                        GEORGE SINNOTT

2       A.    No.   That's in Highland, New York, in the

3  Mid-Hudson Valley.

4       Q.    And that's where your office is?

5       A.    That's correct.   I have an office here in

6  Albany as well, but my main office is in Highland,

7  New York.

8       Q.    Did you remain a commissioner of Civil Service

9  after that?

10      A.    No.

11      Q.    Were you the lead commissioner between your

12 appointment in January '95 and April of '04?

13      A.    I was.

14      Q.    To your own knowledge, after the initial

15 implementation of the battery with the tests given and

16 administered in 1996, do you know of any changes made in

17 the battery test from there until when you left?

18      A.    I don't.

19      Q.    Did you as a commission, understanding you to

20 be one of three commissioners, discuss the battery test

21 as a commission after the initial implementation of it,

22 to your memory?

23      A.    I believe -- I believe there was -- there was

24 at least one conference on the subject.

25      Q.    Okay.   A conference between the commissioners?

64

1               GEORGE SINNOTT

2       A.   Correct -- before the commission, so it would

3   have been somebody requesting a conference and coming in

4   asking for a hearing or an opportunity to discuss a

5   particular issue.

6       Q.   Do you have any recollection of what that

7   issue as it pertained to the battery test was?

8       A.   I don't.

9       Q.   Apart from that occasion, which apparently was

10  initiated by this other party who had an issue she

11  wanted to raise with the commission, if I hear you

12  correctly -- this other party wanted to raise some issue

13  with you all; is that right?

14      A.   I assume that's how it got before the

15  commission.

16      Q.   Were there any other occasions when the

17  commission as a commission, to your memory, as a group,

18  discussed the battery test?

19      A.   You mean just the three commissioners?

20      Q.   Yes.

21      A.   I don't believe so.

22      Q.   Did the commission as a commission get any

23  written reports regarding any aspect of the battery

24  test, to your recollection?

25      A.   I don't know.

65

1                          GEORGE SINNOTT

2        Q.    You don't know of any at this point?

3        A.    I don't know.  I don't know.

4        Q.    Okay.  Was there a commissioner named Margaret

5   Dadd?

6        A.    Yes.

7        Q.    Did Margaret Dadd at some point have delegated

8   to her any responsibilities with regard to changes in

9   scoring?

10       A.    Each of the -- I was president of the New York

11  State Civil Service Commission, and there was myself and

12  two additional commissioners.  Each of those

13  commissioners took turns relative to reviewing test

14  content, test item.  I'm not -- I don't know the jargon.

15       Q.    You never did that?

16       A.    No.

17       Q.    But between the two of them, they alternated?

18       A.    Correct.

19       Q.    And that individual who was at that time so

20  responsible, he or she was in charge of working with the

21  staff, is that accurate, in some manner?

22       A.    I believe the staff would request any changes

23  to the commission, and either of the other commissioners

24  would review the staff product and request and render

25  determination as to a yea or a nay.

66

1                    GEORGE SINNOTT

2       Q.   Can you tell me who the commissioners were

3  that you served with starting in '95, if you remember?

4       A.   I do.  Virginia Apuzzo, A-P-P-U-Z-O, I think,

5  or A-P-U-Z-Z-O.  Virginia Apuzzo.  Robert Reardon,

6  R-E-A-R-D-O-N.

7       Q.   Ms. Dadd?

8       A.   Margaret Dadd.  Leo Kesselring.

9  K-E-S-S-E-L-R-I-N-G.  I think that might have been it.

10      Q.   Okay.  And do you happen to know the

11  professional background of any of these people?

12      A.   Virginia Apuzzo was the commissioner of the

13  Department of Civil Service prior to my arrival.

14      Q.   She was the lead commissioner, in other words?

15      A.   Yes.

16      Q.   All right.

17      A.   And when I was confirmed, she remained on for

18  another two years, I believe, in filling out her full

19  six-year tenure.

20      Q.   Okay.

21      A.   Her background was she was a top manager in a

22  number of different state agencies under Governor Cuomo.

23  She left the commission to become chief of staff to the

24  president of the United States.

25      Q.   Who was?

67

1                        GEORGE SINNOTT

2          A.    Bill Clinton.

3          Q.    All right.  Robert Reardon?

4          A.    Commissioner Reardon was -- I don't believe he

5     was the counsel.  He was a counsel to the senate

6     majority leader in the New York State Senate prior to

7     being appointed.

8          Q.    So he was an attorney?

9          A.    Correct.

10         Q.    Okay.

11         A.    Margaret Dadd was an attorney with a practice

12    in Wyoming, New York.  Wyoming County.

13         Q.    Do you know what area of the law she worked

14    in?

15         A.    I don't.

16         Q.    Okay.  And you mentioned Leo Kesselring?

17         A.    Leo Kesselring was also a lawyer.  I'm not

18    familiar with the nature of his law business either or

19    his education.

20         Q.    Now, you being the lead commissioner, when

21    Dadd and Kesselring were on the commission, was that a

22    job as such and for which they were compensated?

23         A.    They were compensated in the fact that they

24    had term appointments with annualized salaries, and that

25    was one of the duties that they performed.

68

1                          GEORGE SINNOTT

2         Q.    Were they allowed to have other jobs at the

3    same time?

4         A.    Yes.

5         Q.    Okay.  But you were not, or were you?

6         A.    I don't know if I was or wasn't.  I had a --

7         Q.    You didn't?

8         A.    I had a very full-time job.

9         Q.    Right.  Do you know whether Mr. Kesselring and

10   Ms. Dadd did conduct their law practices while they

11   served as commissioners?

12        A.    I believe they did.

13        Q.    Okay.  How frequently under your leadership

14   starting in January '95 did the commission as a

15   commission meet?

16        A.    They met monthly.

17        Q.    And were the meetings public, private, or a

18   combination of both?

19        A.    Public.

20        Q.    Were there agendas?

21        A.    Yes.

22        Q.    Do you know who prepared the agendas while you

23   were the lead commissioner?

24        A.    The Office of Commission Services.

25        Q.    Okay.  Apart from the occasion you told us

69

```
 1                        GEORGE SINNOTT
 2    about a little bit earlier when someone, to your best
 3    recollection, raised an issue that came before the
 4    commission regarding the battery test, was the battery
 5    test ever the subject of an agenda item of the
 6    commission?
 7         A.   I don't know.  I indicated I recall that there
 8    was at least one conference.  I don't know.
 9         Q.   Okay.
10         A.   Again, that was an area I didn't understand,
11    so I deferred judgment to the other two members.
12         Q.   Did you have conversations with the other two
13    commissioners, to your recollection, privately about the
14    battery test?
15         A.   Technically?
16         Q.   Yes.
17         A.   No.
18         Q.   Now, on occasion, sir, as the lead
19    commissioner, did you go to the legislature to testify?
20         A.   I did annually, if not more.
21         Q.   When you gave testimony annually, was it
22    typically before the same body?
23         A.   It was the joint legislative committees, that
24    being the Senate Finance Committee and the Assembly Ways
25    and Means Committee.
```

COURT REPORTING ASSOCIATES, INC.

70

```
 1                    GEORGE SINNOTT

 2        Q.   Did the battery test ever come up in any of

 3   that testimony?

 4        A.   It did.

 5        Q.   Do you have any knowledge of when it came up?

 6        A.   Early on.  '97, maybe.  I don't know the

 7   specific year.

 8        Q.   How did it come up?

 9        A.   Assemblyman Arthur Eve.

10        Q.   He brought it up, you're saying?

11        A.   He did.  I might have brought it up first.  I

12   always addressed the group prior to being questioned.  I

13   would give a synopsis or a briefing as to where we were

14   and where we are at that particular point in time.

15        Q.   What did, to your recollection, the

16   assemblyman say?

17        A.   The assemblyman said that he had heard that

18   the promotion test battery discriminated against

19   minorities.

20        Q.   Was that the first time, to your knowledge, at

21   least, and in your presence, that charge had been

22   publicly made?

23        A.   I think so.

24        Q.   Was the assemblyman a member of the Assembly

25   Ways and Means Committee at that time?
```

COURT REPORTING ASSOCIATES, INC.

71

1                          GEORGE SINNOTT

2          A.    I don't know.

3          Q.    But that's the body you were before?

4          A.    That was the body, so --

5          Q.    Okay.

6          A.    But others were always welcome.  I assume he

7    was a member because most people don't go to hearings

8    they don't have to.

9          Q.    Did you know Arthur Eve before that?

10         A.    No.

11         Q.    To your recollection, that was basically the

12   first time you had been in his presence that you are

13   aware of?

14         A.    I had been in his presence starting at my

15   first joint commission hearing in 1995.

16         Q.    So he was present for '95 and '96?

17         A.    And subsequently.

18         Q.    Okay.  Did you respond to whatever he said?

19         A.    I did.

20         Q.    What did you say?

21         A.    I had indicated that in conversations with my

22   testing -- with my testing professionals, that they were

23   quite confident that that was not the case.

24         Q.    Were you accompanied at that time by staff?

25         A.    Yes.

COURT REPORTING ASSOCIATES, INC.

72

1                    GEORGE SINNOTT

2      Q.   Did the conversation, the colloquy between you

3  and Assemblyman Eve, end at that point?

4      A.   We had general discussions about affirmative

5  action, not only with testing, but with staffing, with

6  the number of offices, Civil Service offices throughout

7  the state of New York.

8      Q.   So you're saying on that occasion, your

9  discussion went from this issue of the test being

10 discriminatory to other subjects?

11     A.   I don't know in this particular instance.

12 Arthur Eve always had questions relative to affirmative

13 action and diversity in the work force.

14     Q.   Okay.  Did he address these questions to you

15 at any time other than when you were at the hearing?

16     A.   There were times when he would ask for

17 specific information or information that I had no or

18 little knowledge of at the time; and I asked him, I

19 believe in every case, that if he had questions, please

20 put them in writing and I would do what I always do, and

21 that would be get back to him in a timely fashion.  I

22 always offered to meet with him at any time, any place.

23     Q.   Did you ever meet?

24     A.   I met once -- we met once prior to one of the

25 annual meetings.  I had asked him to recommend somebody

73

1                    GEORGE SINNOTT

2    for me for an office in Buffalo that we were opening up

3    primarily for outreach purposes.

4         Q.    You mean to staff the office?

5         A.    Yes.

6         Q.    Did he do that?

7         A.    Actually, he did, and I hired the individual

8    who he recommended, which he was quite puzzled by.

9         Q.    He was puzzled that you hired the person?

10        A.    Yes.  Because we were from different -- he

11   viewed us to be from different sides of the political

12   aisle.

13        Q.    You mentioned you were an appointee of

14   Governor Cuomo?

15        A.    I was appointed by --

16        Q.    Initially.

17        A.    I was appointed to the Civil Service

18   Commission by Governor Pataki.

19        Q.    Okay.  Did any of the other legislators ever

20   raise with you questions about the discriminatory impact

21   of the battery test?

22                    MR. KERWIN:  Objection to the form of the

23   question.

24        Q.    You can answer.

25        A.    I have been questioned by -- yes, others.

1                        GEORGE SINNOTT

2        Q.    Do you know who did raise that issue?

3        A.    No.  It was -- no.

4        Q.    Have you ever had any contact with Assemblyman

5    Peter Rivera?

6        A.    No.

7        Q.    Earlier in your testimony you mentioned then

8    Comptroller Carl McCall.  After the audit which you

9    describe as, I think, having occurred before you became

10   the head of the commission, do you have any knowledge of

11   audits that McCall did of Civil Service?  In other

12   words, after you became the commissioner.

13       A.    I believe what the process is, is the

14   controller's office does an audit, and following the

15   distribution of that audit, I believe you have 60 days

16   to respond to the controller's audit; and then in some

17   time frame thereafter, they respond to your response and

18   give a general appraisal as to, you know, have you

19   met -- have you met the recommendations that they

20   proffered in their original report audit.

21       Q.    But did they do a new audit?  Apart from -- I

22   understand the process you just outlined, but did they

23   do a new audit of your agency after you became the lead

24   commissioner -- that's the question -- if you know?

25       A.    I don't think so.